WALTER HENRY BLAND v. THE CITY OF ST. LOUIS, a Municipal Corporation, Appellant.—162 S. W. (2d) 822.

Division Two, May 5, 1942.

Rehearing Denied, June 17, 1942.

*Edgar H. Wayman* and *Jerome Simon* for appellant.

*Reardon & Lyng* and *John H. Martin* for respondent.

LEEDY, J.—This is an action for damages for personal injuries sustained by plaintiff in the fall of a freight elevator by which he and an automobile wherein he was seated were precipitated from the second to the first floor of a warehouse. He had a verdict for $17,500.00, and defendant had appealed from the judgment entered thereon.

Defendant stood on its demurrer offered at the close of plaintiff's case. The injuries were severe and permanent, and defendant does not question the amount of the award, if plaintiff is entitled to recover at all. The refusal of the peremptory instruction and alleged error in plaintiff's instruction No. 1 are the two assignments made on this appeal, and of these the matter of chief insistence is that the demurrer should have been sustained for the reasons: (1) That there was a total lack of proof of control of the elevator in defendant, and a total lack of proof of any duty on its part to maintain the elevator; (2) That there was no evidence that the alleged defective condition of the elevator was or should have been known to defendant, and (3) That plaintiff was guilty of contributory negligence as a matter of law.

Plaintiff, a colored man, thirty-five years of age, was employed by General Motors Corporation (Buick Division), and worked principally at its plant located at Vandeventer and West Pine Boulevards, in the City of St. Louis. The casualty occurred on March 31, 1939, at a two-story building located at 3843-3865 Forest Park Boulevard, owned by said city, and referred to in the testimony as the "city stables." It was so known because formerly devoted to use as a stable for the city's horses and wagons. Plaintiff's employer was using the building for the storage of automobiles, under a written lease from the city, dated February 28, 1939, which lease will be hereinafter discussed.

Plaintiff and his foreman, one Kreinheter, went to said premises on the day in question for the purpose of obtaining an Oldsmobile car which was stored on the second floor. Plaintiff had theretofore re-

moved cars from the first floor of the building, but he had never had occasion to remove one from the second floor, nor to use the elevator. He and his foreman proceeded to the second floor by using the stairway. They positioned the elevator at the second floor level, and set the brake. The elevator was an obsolete, hand-operated type, without safety devices, and known as a carriage elevator, originally designed to carry carriages or light wagons, and with a rated capacity of 4000 pounds, according to the inspection certificate thereon issued by the city. After positioning the elevator, plaintiff got in the automobile, and started to drive it on the elevator platform. What transpired thereafter is reflected by the following excerpts from plaintiff's testimony: "As I put the front wheels of the car on the elevator, it dropped about six inches; I grabbed the emergency brake on the car and stopped it immediately, got out of the car and went over to Herb [Kreinheter]. He said, maybe the brake wasn't holding; he tried to pull the brake and he couldn't move it; then we released the brake a little and pulled the large rope there.

"Q. That is on the pulley wheel? A. Yes. We pulled the elevator level with the floor, then we both tried to pull this brake as tight as we could, which we did. Mr. Northdurft [a city employee] was standing there.

"Q. Did he assist in any way? A. Yes, sir, all three of us pulled on that rope on the elevator.

"Q. On the brake rope? A. Yes. I walked back around to get the car, and Herb was standing there with his hand on the brake rope, and I got all the car on the elevator, all four wheels, except my back bumper, when the elevator gave way, and when the elevator gave way, my back bumper struck the floor, and the car did a nose dive and caught up with the elevator and straightened up before it hit the bottom. After it hit the bottom, I was out."

■ Plaintiff introduced in evidence a lease between the city, as lessor, and plaintiff's employer, as lessee, dated February 28, 1939, purporting to lease "that certain brick building known as 3843-3865 Forest Park boulevard, St. Louis, Missouri, with appurtenances." It provided that said building was "to be used for the storage of automobiles commencing February 28, 1939, and expiring March 31, 1939," and thereafter on a month to month basis until cancelled in the manner therein provided. The lease stipulated that "the Lessor shall keep in repair the roof and exterior of the building . . . *and the elevator or elevators,*" with a provision for reimbursing the lessee for repairs in the event of the lessor's failure to timely make the same. Under this showing, defendant contends that it is not liable, and invokes the doctrine of such cases as Eyer v. Jordan, 111 Mo. 424, 19 S. W. 1095; Mahnken v. Gillespie, 329 Mo. 51, 43 S. W. (2d) 797; Bender v. Weber, 250 Mo. 551, 157 S. W. 570; Turner v. Ragan (Mo.), 229 S. W. 809. Plaintiff's action is not bottomed

on any breach of the city's covenant to repair, but rather on the theory that the latter was in possession of the premises, and in connection therewith maintained and controlled the elevator. The cases relied on by defendant involved situations where the allegedly defective premises were in the exclusive possession of the tenant, and hence the liability, if any, would be that of the tenant and not of the landlord. Now what are the facts with respect to the nature of the tenancy of plaintiff's employer as to the exclusive occupancy and possession? It does appear that some days—less than a month—before plaintiff was injured, the lease in question was entered into, and that the lessee was storing automobiles in and upon the premises. But it also appears that the witness Northdurft, the city's harness maker, continued to occupy quarters on the second floor of the building as a workshop, and in connection therewith he used the elevator for the purpose of carrying his materials up and ▇ down. He was still so occupying said quarters as late as the date of the trial, which was a number of months after plaintiff was injured. A reasonable inference to be drawn from this evidence is that the city had not put plaintiff's employer into full and exclusive possession and control of the demised premises, as tenant, thus making inapplicable the rule contended for by defendant.

▇ The trial court did not err in overruling the demurrer under the second ground here urged, as the following evidence will show. There was a keyway cut into the shaft, and a key is driven into the key-shaft between the gear and the shaft to hold them solidly, so that when the hand pulley is pulled, the two gears mesh and turn the hoisting drums. If this key is out of the key-shaft, and the hand rope is pulled, thereby turning the larger gear, still the hoisting drums, around which are wrapped the cable that raises and lowers the elevator platform, will not move. The elevator is operated by means of four one-half inch cables connected onto the hoisting drums and to each corner of the car. At the center of the car there are two more half-inch cables connected to counterweights to balance the car. The counterbalances should be approximately 40 per cent over the rated load capacity, which, in this instance, was 4000 pounds, and the counterbalance weights in question were only 960 pounds, instead of 5600; that if properly counterbalanced, the elevator would go down, but rather slow, even if the brake did not operate. It may be observed that the Oldsmobile weighed 3000 or 3100 pounds. At the time plaintiff's expert, one Brooks, a safety engineer, inspected and photographed the elevator in July following the accident, he "took a hammer with the intention of pounding the key to see if it was in there solidly, and as I got up to put my hand on the shaft, the key fell out." The end of the pin was broken, and appeared to have been for sometime; it was rusted and corroded and had numerous hammer marks on it. Northdurft was present on the

occasion and told the witness he had put the key back several times before. The expert further testified he did not see any set-screw to keep the pin in place, but stated if the key were in there properly, it would not be necessary to put a set-screw on it. The pin at that time gave evidence of having been out before, but the opening did not. The witness Northdurft, the city's harness maker, testified that on the afternoon of the date on which plaintiff was injured, or the following morning, when he wanted to use the elevator, and discovered it would not operate, he found the pin or key was missing, and he located it on the elevator and put it back; that with the key out of place, the axle on which the cogwheel is located is entirely disconnected and disengaged, and the pulley wheel does not operate, and the elevator will not move. Wholly apart from the broken, rusted and defective condition of the key with hammer or chisel marks thereon, the evidence is undisputed as to the requirements for proper counterbalancing, and under such showing, we are not disposed to say no case was made on this issue.

 Defendant asserts plaintiff was guilty of contributory negligence as a matter of law, which claim is based on plaintiff's admissions, and particularly the italicized portions of the following excerpts from his testimony, as set forth in the brief:

"Q. Then what did you do? A. *I started easing the wheels on there; just as I got my front wheels on there the elevator gave way;* I pulled the emergency brake on the car and stopped the car.

"Q. Did the wheels go below the level of the floor at all? A. About six inches.

"Q. About six inches? A. Yes, sir.

"Q. Still on the platform, were they? A. The front wheels; yes, sir.

"Q. That is what I mean. Then after that happened you say you applied the brake? A. Of the car, stopped the car.

"Q. Did Herb say anything to you then? A. He said, 'Maybe the brakes isn't tight.'

"Q. Did he holler to you to stop? A. No, I stopped when it dropped.

"Q. You stopped it yourself when it dropped? A. Yes, sir.

"Q. *Did you think at that time there was something wrong with the elevator?* A. *I knew there was something wrong.*

"Q. *And you knew and felt at that time it would be dangerous to drive that car onto the elevator?* A. *Yes, sir.*

"Q. Then you got out of the car and went over with Herb, and what did you do then? A. Tried the brake and *there wasn't anything wrong with the brake;* then we released the brake enough to draw the elevator level with the floor, then we both pulled the brake, and the gentleman working for the City was up there; he got hold of the brake with us; all three of us pulled the brake on

and this City gentleman, he stepped aside, and Herb held to the brake, and he said it was all right now.

"Q. He said it was all right now? A. Yes, sir.

"Q. Then you got in the automobile and drove it onto the platform? A. Yes, sir."

In explanation of his answer that he felt it would be dangerous to drive the car onto the elevator, he further testified, on redirect examination, "I don't mean—I didn't know that the elevator was dangerous; the only thing, about the slipping, I thought the brake wasn't tight." The evidence shows he got out of the car, and with his foreman and the city harness maker, went over and again positioned the elevator and "pulled the brake on" tight. The foreman testified he thought the drop of six inches was caused by a stretching in the cables "caused by the load." There was nothing to indicate plaintiff had any knowledge that the key was broken and out of repair, or, indeed, that he knew anything about the mechanism of the elevator, nor the matter of counterbalancing. We are not prepared to say that the danger was so glaringly apparent that an ordinarily prudent man, under the same or similar circumstances, would not have acted as plaintiff did, and, therefore, the question of his contributory negligence was for the jury.

The phrase "on the date mentioned in the evidence" is used three times in plaintiff's main instruction and defendant, as its first ground of attack thereon, says this renders the instruction indefinite and uncertain, and permitted the jury to guess or surmise as to what date was referred to. Upon a careful reading of the instruction we do not think it can be reasonably understood as having reference to any other time than the date of the accident. The other ground of complaint is that, as regards the hypothesis submitted in reference to counterbalancing, the instruction is broader than the evidence warranted. The instruction authorized a verdict for plaintiff if, among other things, it found "that said elevator was not properly and adequately counterbalanced and that said elevator was directly thereby rendered unsafe for use." Defendant seems to tacitly concede that the testimony of plaintiff's expert Brooks would be sufficient, if it were not for the fact that his testimony was based upon an examination made by him some three or four months subsequent to the time plaintiff was injured. That testimony has been summarized. The complicated and permanent way in which the counterbalancing weights were attached, and his testimony as to the exact poundage of each of said weights, in the absence of an objection going to the matter now urged, we think made a sufficient showing upon which to predicate the instruction in the respects in which it stands challenged.

From what has been said, it follows that the judgment should be, and it is affirmed. All concur.